AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

V.

JILL DOUCETTE

**CRIMINAL COMPLAINT**

CASE NUMBER: MJB 04-816-MBB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___February-March 2004___ in ___Essex & Middlesex___ county, in the _____ District of ___Massachusetts___ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally combine, conspire, confederate, and agree with others to distribute heroin, a Schedule I controlled substance

in violation of Title ___21___ United States Code, Section(s) ___846___.

I further state that I am a(n) ___DEA Special Agent___ and that this complaint is based on the following
Official Title

facts:

See Affidavit of DEA Special Agent Steven C. Story attached hereto and incorporated by reference herein

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

04-08-2004  @ 4:00 PM                           at        Boston, MA
Date                                                      City and State

Marianne B. Bowler
Chief U.S. Magistrate Judge                    _____
Name & Title of Judicial Officer                  Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

**Affidavit of Steven C. Story**

I, Steven C. Story, on oath depose and state that:

1.  I am a Special Agent with the Drug Enforcement Administration ("DEA") and I have been so employed for approximately 17 years. During the course of my career, I have received specialized narcotics training from DEA and I have been involved in over 400 narcotics investigations involving the use of various investigative techniques, including controlled purchases of narcotics, the use of confidential informants and other cooperators, physical surveillance, electronic surveillance, and financial investigations. Since June 2003, I have been assigned to DEA's Mobile Enforcement Team, which has been conducting an investigation of certain narcotics dealers on the North Shore.

2.  Since December 2003, I have been involved in an investigation of **Thomas Scola ("Scola")**, a 36-year old man who resides at various locations in Gloucester, and **Federico Nivar ("Nivar")**, a 43-year old man who resides in Lawrence. The information set forth in this affidavit is based on my personal participation in this investigation as well as on information provided to me by other DEA agents, law enforcement officers, and public and private databases. I am submitting this affidavit to establish probable cause that **Jill Doucette ("Doucette")** has conspired with Scola and Nivar to distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846.

Accordingly, I have not included each and every fact known to me as a result of my participation in this investigation.

3. As a result of my participation in this investigation, I have learned that **Doucette** is a 24-year old woman who resides at various locations in Gloucester. She has an adult criminal history in Massachusetts dating back to 1998, including the following prior convictions: (1) possession of heroin, larceny, forgery, and uttering (1998 - continued without a finding); (2) larceny (3 counts) and forgery (3 counts) (1998 - continued without a finding); (3) possession of heroin and conspiracy (1998 - continued without a finding); (4) knowingly being present where heroin is kept (1999 - continued without a finding); (5) forgery, attempt to commit a crime, and conspiracy (2002); (6) assault and battery (2002); and (7) possession of heroin (2003).

4. From December 18, 2003 to March 30, 2004, a DEA undercover agent ("UCA") made 13 controlled purchases of heroin directly from **Scola**. The first such purchase occurred in front of a motel in Gloucester (Essex County), where Scola was then residing. The subsequent purchases occurred in the parking lot of a convenience store in Reading (Middlesex County) near Route 128, except for one purchase, which occurred in the parking lot of a liquor store in Peabody (Essex County). The investigation revealed that, prior to the sales, Scola negotiated the sales over the telephone with the UCA, stating in several of the

2

telephone conversations that he would be meeting with his regular supplier before the sale. Scola then employed various persons to drive him from Gloucester to the agreed-upon location for each sale. **Doucette** was Scola's driver for three of the heroin sales to the UCA. The investigation further revealed that, prior to and immediately after most of the sales, Scola was driven to and met with his heroin supplier in a nearby residential neighborhood in Wakefield (Middlesex County). During the investigation, the supplier was identified as **Nivar,** who was frequently observed driving a Toyota Camry registered to him at an address in Lowell. All of the hand-to-hand purchases from Scola were surveilled and recorded by DEA and many of them were videotaped. Surveillance agents observed many of Scola's meetings with Nivar, either immediately before or after the heroin sales. Many of the telephone conversations with Scola before and after the purchases were recorded by DEA.

**Controlled Purchase on February 10, 2004**

5.  On February 9 and 10, 2004, Scola and the UCA had multiple telephone conversations concerning a purchase of heroin. Scola stated that he would contact his source of supply (Nivar) and that he would meet the UCA at the same Cumberland Farms parking lot in Reading as they had used for prior heroin sales on the afternoon of February 10 in order to sell the UCA an additional amount of heroin. On February 10, surveillance agents

observed Scola and Doucette leave a residence in Gloucester in a white Hyundai Sonata. Doucette was driving the Hyundai. They drove directly to same area of Wakefield as Scola had used when meeting his supplier in prior heroin deals and parked. Approximately ten minutes later, Nivar's black Camry drove slowly by the white Hyundai. The Hyundai followed the Camry out of the area. At about this time, Scola called the UCA and told him to be at the location in Reading.

6.   Approximately ten minutes later, Doucette drove the white Hyundai into the Cumberland Farms parking lot in Reading. Scola got out of the Hyundai and entered the UCA's car where he sold the UCA a clear plastic bag of heroin for $1,450.00 in cash. During this sale, Scola told the UCA that his source (Nivar) would be willing to deal directly with the UCA in March. The substance purchased that day was analyzed at a DEA laboratory and determined to be 9.7 grams of heroin.

7.   After the sale, Scola returned to the Hyundai and Doucette drove it back to the same area in Wakefield. The Hyundai was observed by surveillance agents meeting up with Nivar's black Camry. Surveillance agents then followed Scola and Doucette as they drove back to Gloucester.

**Controlled Purchase on March 24, 2004**

8.   On March 24, 2004, Scola and the UCA again agreed to meet at the same Cumberland Farms in Reading to conduct a sale of

heroin. Scola arrived in the same white Hyundai Sonata, which was being driven by Doucette. Scola got into the UCA's car and sold the UCA a clear plastic package of heroin for $1,450.00 in cash. During this meeting, Scola remarked that he had recently been arrested for a driving offense. The substance purchased on March 24 was field-tested, with a positive result for the presence of heroin.

9. After this sale, surveillance agents followed the Hyundai, which was driven by Doucette to the same area in Wakefield, where it met up with Nivar's black Toyota Camry. A surveillance agent observed that Nivar was driving the Camry. After observing both vehicles driving in tandem, surveillance agents lost contact with them. A short time later, surveillance agents followed the Hyundai as it was driven back to Gloucester.

### Controlled Purchase on March 30, 2004

10. On March 30, 2004, Scola and the UCA had recorded telephone conversations wherein they agreed to meet at the same Cumberland Farms in Reading to conduct a sale of heroin. That afternoon, the UCA was called by Scola, who stated that he was with his supplier (Nivar). At about the same time, surveillance agents observed the same white Hyundai Sonata driving in the same area in Wakefield as it had been seen on prior occasions. The Hyundai was being driven by Doucette and it contained Scola.

11. A short time later, Doucette drove the white Hyundai into the Cumberland Farms parking lot in Reading. The UCA parked next to the Hyundai and conversed with Doucette, who was alone in the car while Scola went into the Cumberland Farms. During this conversation, the UCA asked Doucette if she was "cool" and if she knew what was going on. Doucette responded that she knew what was going on. While talking about the UCA's drive in from Worcester, Doucette remarked that she had purchased "dope" (heroin) once in Worcester and that the quality was not that good. Moments later, Scola exited from the store, entered the front passenger seat of the UCA's car, sold the UCA a clear plastic package of heroin for $1,450.00 in cash, and then returned to the Hyundai. The substance purchased that day was field-tested, with a positive result for the presence of heroin.

12. After the sale, surveillance agents followed the white Hyundai as Doucette drove it back to the same area in Wakefield, where it met up with Nivar's Camry. The two cars drove together on various streets until they went out of view of the surveillance agents. A short time later, surveillance agents followed the Hyundai back to Gloucester.

**Doucette's Arrest on April 7, 2004**

13. On April 7, 2004, the UCA had multiple telephone conversations with Scola concerning another purchase of heroin. It was agreed that they would meet at the same Cumberland Farms

6

parking lot in Reading. Prior to the deal, surveillance agents observed Nivar driving from Lawrence to the Wakefield area in his black Toyota Camry. The Camry was stopped and Nivar was arrested on a federal arrest warrant. The agents recovered from Nivar a quantity of powder, which was field-tested, with a positive result for the presence of heroin.

14. Shortly after that, agents observed Doucette and Scola driving in Wakefield in the same Hyundai Sonata. Doucette was driving the Hyundai. The vehicle was stopped and Scola was arrested on a federal arrest warrant. Doucette was arrested without a warrant based on probable cause. After being advised of her constitutional rights, Doucette stated that she understood her rights and that she wished to speak with the agents. Doucette stated that she knew the prior trips with Scola involved heroin sales, that she usually followed Nivar's Camry while Scola obtained the heroin from Nivar, that she drove Scola to and from the deals with the UCA, and that she intended to do the same on this date. Doucette stated that she used heroin and that she obtained heroin from Scola for doing the driving. This morning (April 8), as she was being driven to the federal courthouse, Doucette repeated many of the above statements and added that she often took messages over the telephone from Nivar when Scola was unavailable. Doucette further stated that she used heroin and that she had not held a job for five years.

47. Based on the foregoing, I believe that there is probable cause to believe that, from February 2004 through March 2004, **Jill Doucette** conspired with Scola and Nivar to distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846.

_____
Steven C. Story
Special Agent, DEA

Sworn to and subscribed before me this 8th day of April 2004.

_____
Marianne B. Bowler
Chief U.S. Magistrate Judge